623 So.2d 1193 (1993)
SAVE THE ST. JOHNS RIVER, Appellant,
v.
ST. JOHNS RIVER WATER MANAGEMENT DISTRICT and David A. Smith, Appellees.
No. 92-305.
District Court of Appeal of Florida, First District.
August 23, 1993.
*1194 Thomas G. Tomasello, Oertel, Hoffman, Fernandez & Cole, P.A., Tallahassee, for appellant.
Wayne E. Flowers, Gen. Counsel, St. Johns River Water Management Dist., Palatka, for appellee St. Johns River Water Management Dist.
Bram D.E. Canter and Darren A. Schwartz, Haben, Culpepper, Dunbar & French, P.A., Tallahassee, for appellee David A. Smith.
*1195 ZEHMER, Chief Judge.
We review by appeal, pursuant to section 120.68, Florida Statutes (1991), a final order of the Florida Land and Water Adjudicatory Commission. The Commission, consisting of the Governor and Cabinet exercising their powers of appellate review pursuant to section 373.114, Florida Statutes (1991), affirmed the final order of the St. Johns River Water Management District granting David A. Smith's application for a management and storage of surface waters (MSSW) permit in connection with a proposed residential and golf development situated adjacent to Lake Poinsett. Appellant, SAVE The St. Johns River Association, Inc.,[1] challenged the District's notice of intent to issue the MSSW permit in a timely filed petition. The matter was referred to the Division of Administrative Hearings, a formal evidentiary hearing was held, and the hearing officer recommended approval of the permit application on specified conditions (these conditions are not disputed on appeal). The District's final order adopted the hearing officer's recommended order in its entirety, granted the permit on the conditions stated therein, and dismissed SAVE's petition. The Commission affirmed the District's decision on a closely divided vote, concluding that on the record made before the hearing officer and the District there were no inconsistencies between the District's final order and the purposes, objectives, and provisions of chapter 373, Florida Statutes. The Commission rejected each of the contentions made by SAVE in a thorough and well reasoned order, which we now affirm.

I.
The District is empowered by law to review applications and to issue MSSW permits for projects within its boundaries.[2] Smith applied for an MSSW permit to construct a stormwater management system to serve a proposed residential and golf development to be known as Sabal Hammocks. The proposed project is to be located on land that has been used since the 1950's for agricultural purposes that included cattle grazing and cultivation of crops such as rye and oats. The proposed site is adjacent to Lake Poinsett and related marsh land, and lies within the St. Johns River Water Management District. The receiving waters for stormwater discharge from the proposed development will be Lake Poinsett and its adjacent marshes.
Currently, a dike system exists along the southern boundary of the proposed development property and separates the internal grazing lands from the lower marsh and flood areas external to the dike. The dike system has been in place since it was originally constructed in 1973. A series of ditches cross the parcel and drain the areas within the dike system. Pursuant to a consent order previously approved by the District, two agricultural discharge pumps currently are in use at the site and discharge waters into the marshes adjacent to Lake Poinsett. When the dike was constructed in 1973, employees of the Department of Natural Resources and the Florida Marine Patrol inspected the construction for the specific purpose of determining whether it was being constructed in accordance with the requirements of existing law. They informed Smith that the construction did not require a permit from the state agency. At that time, the District did not have permissive permitting authority over *1196 the construction of this dike system. Although detailed specifications for the original construction are not shown by the record, it was established that the majority of the dike structure has remained in place over the ensuing period and was sufficient to indicate the original dimensions of the dike system.
In 1978, the Department of Environmental Regulation (DER) issued Smith a permit to construct a new dike landward of the 1973 dike and authorized 21 breaches to be made in the old dike. Only 12 breaches were actually cut in the old dike, and none of these were brought down to ground level (the record indicates they remained some 3 to 4 feet higher than the ground on which the dike was constructed). Construction of the new dike was later abandoned and never completed. The 1973 dike remained intact throughout its entire length and continued to impede water movement from the marsh into the agricultural areas. In 1986, Smith informed the District, DER, and the U.S. Army Corps of Engineers that he had abandoned construction of the new dike and planned to restore the old dike to its original condition and dimensions by filling in the 12 breaches. All three agencies allowed this work to be completed without objection and did not require Smith to obtain a permit for this restorative work. Although no written engineering plans existed for the 1973 dike system, it was established that the dike had been constructed to an elevation of 22 feet and a width of 10-12 feet at the top. As the construction of the 12 breaches left the majority of the original dike in place, written design specifications were not required for the District to determine that the restorative work did not extend beyond the original construction specifications of the dike system.
The stormwater management and treatment system authorized under the MSSW permit will treat stormwater from the site prior to any discharge off-site in a manner that sufficiently meets or exceeds all state water quality standards. Wetland impacts associated with the proposed project are minor and will be offset by the plan for creation and enhancement of wetlands on site. The two existing agricultural pumps will be replaced by a single pump station having a total pump capacity no greater than the two existing pumps. After development, the peak rate of discharge from the site will not exceed the pre-development rate, and the volume of discharge from the site will be less after development than before development.
The District accepted the recommended findings of fact and conclusions of law in the hearing officer's recommended order and directed that the permit be issued on the recommended conditions. SAVE then appealed to the Commission, urging that the matter be remanded to the District or the hearing officer for further findings on the legality of the original dike construction and the restorative work. SAVE argued that the record failed to contain competent, substantial evidence to support a finding that the land involved should be excluded from the St. Johns River floodplain, as the District had done by recognizing the presence of the dike system as the pre-development condition of the property. DER gave the Commission its recommendation on this matter pursuant to section 373.114, Florida Statutes (1991). It urged that the matter be remanded for further findings because: 1) whether the original dike was legally constructed had not been properly adjudicated in this proceeding, and this prevented DER from accurately determining whether the District was correct in its assertion that the pre-development condition was that of a diked parcel; and 2) the District has been actively acquiring floodplain in the upper St. Johns River basin, but in this case had permitted a surface/stormwater management project serving a development that lies partially within the floodplain, contrary to its general objective to acquire and protect floodplain in the area. For these reasons, DER asserted, the project does not meet the overall objectives of the District. The Commission rejected SAVE's contentions and DER's recommendations and concluded that the record supports the findings of fact on which the District's decision was predicated. It noted that DER's recommendations were based on matters within its own records that had not been made part of the record in this case, and these matters could not be considered as a basis for reversal because the Commission's power of review "is appellate in nature and shall be based on the record *1197 below," as specified in subsection 373.114(1)(b), Florida Statutes (1991).

II.
Although SAVE raises three specific points on this appeal, according to the summary of argument in its initial brief, these points present essentially two arguments.
The first argument urges that the District used the wrong "pre-development" condition in its review and assessment of Smith's MSSW permit application, and has two components. One, if the extensive dike constructed in the early 1970's was illegally constructed, then the District incorrectly determined the "pre-development" condition of the site to be a diked parcel that is separate from the floodplain of the St. Johns River. Two, if the cuts made in the dike in the early 1980's were illegally filled, the District incorrectly determined that the pre-development condition of the site was the original dike system. SAVE further argues that the findings of fact and conclusions of law in the hearing officer's recommended order and the District's final order fail to contain sufficient reference to these illegality issues, and that the Commission erred in refusing to grant SAVE's request that the case be remanded to the District to make adequate findings on the legality of the original dike construction and the restoration construction.
SAVE's second argument contends that approval of the MSSW permit is inconsistent with the District's overall objective of restoring the floodplain of the St. Johns River. Urging that MSSW permits must be consistent with this objective, it points out that no findings of consistency with this objective were made by the hearing officer or the District, and that Appellees did not provide any evidence to prove this essential finding at the section 120.57 hearing. Thus, SAVE argues, the Commission erred in not granting its request that the case be remanded for findings on whether the MSSW permit is consistent with the District's floodplain restoration objectives.

A.
SAVE's first argument basically asserts that the original dike and the restoration of the breaches in the original dike were constructed in violation of law and cannot legally serve to separate the proposed project site from the St. Johns River floodplain, and for this reason the District should have treated the land in issue as part of the floodplain. Since the legality of the dike system, both in its original state and as restored, is critical to the proper review of this permit application, SAVE argues, this legality issue should have been, but was not, the subject of adequate specific findings in the District's final order. We reject these contentions and agree with the Commission that the District used the correct pre-development condition of the land in reaching its permitting decision.
In reaching its decision, the District treated the pre-development condition of the land covered by Smith's MSSW permit application as a diked impoundment separated from Lake Poinsett and the St. Johns River floodplain by the existing dike system. As shown by the record, it has been and is the District's practice to define pre-development conditions to mean those conditions that were existing on the date the permit program in chapter 40C-4, Florida Administrative Code, was first implemented. Since the program for the Upper St. Johns River where the property in dispute is located was first implemented in 1977, see rule 40C-4.031(1)(a), Fla. Admin. Code. (1992), the District concluded that the perimeter dike was a pre-development condition because the dike system existed in 1977.
We also agree with the Commission that any illegality in the construction or restoration of the dike was not a relevant issue in this permitting proceeding.[3] The legality *1198 of the original construction of the dike was not relevant to this proceeding because compliance or noncompliance with another agency's permitting program should not be litigated in this administrative permitting proceeding that must be conducted under statutes and rules relating solely to the District's permitting authority. We agree that it is inappropriate for the District to determine in this proceeding whether a permit was required by another agency for past construction under statutes and rules being enforced by that other agency. The District was required in this proceeding to determine only whether Smith's application met the requirements imposed by the existing statutes and rules the District is charged with enforcing at this time. See Council of the Lower Keys v. Charley Toppino & Sons, Inc., 429 So.2d 67 (Fla. 3d DCA 1983). In their Amended Joint Prehearing Statement, the parties agreed that, "[O]nly the permitting criteria in Chapters 40C-4, 40C-41 and 40C-42, Florida Administrative Code, apply to this application." SAVE has not identified any permitting rule or other law requiring a determination of the legality of the original construction of the dike system prior to the issuance of the MSSW permit at issue. SAVE has not identified any applicable rule, law, or requirement governing the issuance of an MSSW permit that Smith has failed to satisfy. Also, none of the rules cited by the parties as governing the issuance of the MSSW permit requires that a determination of the legality of the dike at time of construction be made prior to the issuance of the permit. See rules 40C-4.041, 40C-4.091,[4] 40C-4.301, 40C-41.063, Fla. Admin. Code. See also rules 40C-42.041 [repealed September 25, 1991], 40C-42.061, Fla. Admin. Code; § 403.813(2)(g), Fla. Stat. (1991).

B.
However, even if we assume that the legality of the original dike construction and the filling of the subsequently cut breaks or notches in the dike could be a relevant consideration, that issue was fully litigated in this proceeding and the record amply supports the conclusion that no such illegality has been shown. The record contains competent, substantial evidence to support the ruling by the District, as recommended by the hearing officer, that the original dike was constructed in accordance with all lawful requirements existing at that time. The hearing officer found as a fact that:
14. Neither the District nor DER has asserted that the work to complete the original dike in the 1970s, nor the breaches completed in the 1980s, nor the restoration of the breaches in 1986 was performed in violation of the law. Further, the District had knowledge of the subject activities.
She recommended in the conclusions of law that:
10... . Save has not established that the dike system currently in existence was constructed or approved contrary to law.
The Commission's order upheld these findings and conclusion, noting that, inter alia:
7... . The legality of the breaches, the legality of the failure to breach to grade level and the legality of the restoration were litigated by the parties. The legality of the construction of the perimeter of the dike in 1973, however, was not litigated. Illegality of the construction of the dike was not pled by the petitioner in the petition challenging the district's notice of intent to issue the permit.[5]
[5] The legality of the dike's construction may have been placed in issue by the Amended Joint Prehearing Statement. See Paragraph 7(a)(5) of the Statement, (R. 9). We need not decide this question since we conclude that the applicant met the burden of proof as to the legality of the construction of the dike.
And SAVE did not present any evidence that the dike was illegal when constructed. *1199 The only reference to illegality of the construction is in SAVE Exhibit No. 2; a document purporting to be a copy of DER permit No. 05-35-4053 issued April 18, 1978 by then DER Secretary Joseph W. Landers with a date stamp of May 3, 1978 showing receipt by the St. Johns River Water Management District. The copy of the permit, in describing the permitted activity states, "The applicant seeks approval for the new work, and after-the-fact approval for the existing work, as described in the subject application." (R. 48). This reference is of no help to DER's recommendation or to SAVE's case in this review proceeding because when SAVE sought to have it introduced at the hearing through Jennifer Cope the following transpired: [The document was allowed to be introduced for the limited purpose of showing that the District had knowledge of it based on the representation by SAVE's attorney that it was not being offered to prove the truth of the matter asserted in the document]. * * *
8. In contrast to SAVE's failure to prove the dike system to have been constructed contrary to law,[6]
[6] See Conclusion of Law 10 in the Recommended Order of the Hearing Officer, (R. 188).
Smith introduced the testimony of former Marine Patrol Officer Frank Demsky, who investigated the construction of the dike in 1973 when the Marine Patrol was the law enforcement arm for the Trustees of the Internal Improvement Trust Fund. On his first visit to the site Demsky determined that the dike construction did not need a state permit and told the Smith's property manager that if the rest of the construction continued along a line indicated on their drawings that it would not need a permit. Demsky visited the site two more times, two weeks and 3-4 weeks, respectively, after the first visit, and determined that the work was within the confines of the drawings, so that a state permit was not required for the work.
9. In reliance, in part, on testimony of the former Officer Demsky, Smith submitted the following proposed finding of fact in his Proposed Recommended Order:
73. When Demsky investigated the construction of the 1973 dike, he determined that the work was above the OHWL of Lake Poinsett and, therefore, did not require a state permit. [Citation omitted.] His determination was based in part on the fact that the soil was being excavated to construction (sic) the dike was very dry, white, sandy soil (Id., pp. 37-38) and the construction was not in or adjacent to any wetland. (Id., p. 41). Demsky's observations are consistent with the testimony of Smith who stated that the location of the 1973 dike was selected to coincide with "solid ground." [Citation omitted]. (sic) Smith's testimony, in turn, is consistent with Duke Woodson's statement that agricultural dikes were typically built based on the quality of the soil. [Citation omitted]. (sic) (R. 117).
This proposed finding of fact was accepted by the Hearing Officer... .
10. At bottom, it is apparent to us that not only did SAVE fail to prove the dike construction to be illegal, the Applicant carried its burden of presenting a prima facie case that the construction was legal. At that point the burden of proving illegality shifted to SAVE, a burden that SAVE neither met nor, as is apparent from the record, attempted to meet.
There is competent, substantial evidence in the record to sustain the findings of fact in the recommended order adopted by the District. Contrary to SAVE's argument, there is no error in the Commission's ruling that the testimony of Florida Marine Patrol Officer Frank Demsky constitutes a prima facie showing of legality of the construction of the dike in 1973. SAVE's argument, that this testimony cannot constitute competent evidence to support the finding that the dike was legally constructed because Officer Demsky was not qualified as an expert to express an opinion on the location of the ordinary high water line, misconceives the purpose and probative value of Officer Demsky's testimony. Demsky investigated the construction of the dike in 1973 when the Marine Patrol was the law enforcement arm for the Board of Trustees of the Internal Improvement *1200 Trust Fund, which at that time had permitting authority over this area pursuant to chapter 253, Florida Statutes.[5] The District had no permitting requirements applicable to the construction of the dike in 1973. Demsky's testimony established that Smith had constructed the dike without obtaining any permit because the state agency then responsible for such permitting had led Smith to believe that the dike was entirely proper and needed no permit for its construction as long as the dike followed the line indicated to Demsky; and thereafter Demsky inspected the project to see that the dike did so. Smith was entitled to rely and acted on the representations of the permitting agency's representative, and no objection to the legality of the original construction of the dike was ever raised by the District or DER. Hence, the Commission correctly concluded that Smith made a prima facie showing of the apparent legality of the original dike construction, thereby shifting the burden to SAVE to present evidence to the contrary. Florida Dept. of Transp. v. J.W.C. Co., Inc., 396 So.2d 778 (Fla. 1981). For Demsky to testify on these matters, it was not necessary that he be qualified as an expert to express an opinion on the ordinary high water line, as this testimony related primarily to matters of fact, not expert opinion.
SAVE further argues that it carried its burden of showing the illegality of the original construction by introducing the permit from DER that showed the new dike to be constructed by Smith was waterward of the ordinary high water line, and that the Commission erred in not considering that document as proof of these facts. The Commission correctly ruled, however, that this permit was hearsay evidence admitted in evidence for the sole, limited purpose of showing that the District had knowledge of the DER permit authorizing another dike (that Smith never constructed) and the matters stated therein; that document was not received as competent proof of the truth of the matters set forth in the document because SAVE's attorney so stipulated when the permit was admitted. Neither the Commission nor this court, in the exercise of its appellate review authority, is authorized by law to give that document probative value that is greater than the limited purpose for which it was admitted. SAVE offered no other evidence of illegality of the original construction.

C.
SAVE next argues that, irrespective of the legality of the original construction of the dike, the District erred in reviewing the application as if the original dike were intact and functioning because Smith's filling in the breaks was itself illegal. SAVE argues that these breaks had been cut in the dike pursuant to a DER permit issued on April 18, 1981, authorizing 21 breaks in the dike, eight to be 100 feet wide and 13 to be 50 feet wide. SAVE further asserts that, "[t]he breaks were to be cut to marsh level, as a requirement by DER to resolve a violation associated with construction of the original dike." Essentially, SAVE argues that the authorized breaks should have taken the dike down to marsh level (whether or not this was actually done), thereby permitting the impoundment area to connect to the level of the river floodplain; thus, Smith could not lawfully fill in these breaks without obtaining a further permit from DER.
The record shows that the breaks in the dike were never taken down to the floodplain level when the cuts were made in 1983. Smith restored the dikes to their original configuration in 1986 by filling the breaks only after conferring with the District. Smith met with the District's Director of Resource Management and with the District General Counsel, who told Smith that he could fill the breaks without a District permit pursuant to the exemption in subsection 403.813(2)(g), Florida Statutes. That section provides an exemption from any chapter 373 or chapter 403 permit requirement to perform:
[t]he maintenance of existing insect control structures, dikes, and irrigation and drainage ditches, provided ... [that in] all cases, no more dredging is to be performed than is necessary to restore the *1201 dike or irrigation or drainage ditch to its original design specifications.
The Commission made the following rulings relevant to this issue:
14. The remainder of SAVE's arguments for rescinding the permit or remanding the case are rejected. Unlike the dike in Church of Jesus Christ of Latter-Day Saints v. St. Johns River Water Management District, 489 So.2d 59 (Fla. 5th DCA 1986), upon which SAVE relies, the dike in this case never ceased to function as a dike because it was never brought to grade. It was not required to be brought to grade unless the alternate dike was constructed and the alternate dike was not constructed. As for the exemption from permitting the restoration of the breaches, Section 403.813(2)(g), Florida Statutes, does not require the submission of original design specifications as SAVE argues. It limits the exemption to original design specifications. Although the Hearing Officer found these to be unknown, the Hearing Officer found that the restoration of the dike entailed filling to conform to the dike's "original design." (R. 194, R.O. p. 27, Ruling 46 on Proposed Findings of Fact submitted by the Applicant.)
SAVE makes several challenges to the Commission's ruling on this issue. Among other things, it argues, first, that the finding that the dike was functional with the breaks cut in the dike is not supported by competent, substantial evidence and conflicts with the hearing officer's findings that boats could navigate through the breaks, a fact that conclusively indicates that the dike was not functioning as it should. Second, it argues that Smith had no written authorization to conduct the filling activities. Third, it argues that the filling and closure of the breaks did not qualify for the exemption in subsection 403.813(2)(g). None of these contentions withstands close scrutiny.[6]

1.
As to SAVE's first contention regarding the lack of competent, substantial evidence, the evidence established that the dike was functional even with the breaks in place, and that it did not fail to impede the movement of water to Smith's property under normal conditions. SAVE's argument that it did not because the hearing officer found that the breaks or notches were "cut to a sufficient width and depth to allow boats to navigate through the dike" misconstrues the hearing officer's findings. The hearing officer specifically found that:
10. Sometime in the 1980s, several openings or breaches were cut in the dike system. Those breaches were opened pursuant to permits issued by the District and the Department of Environmental Regulation (DER). The breaches were cut to a sufficient width and depth to allow boats to navigate through to anterior areas of the subject property during those times when the water levels outside the dike would allow such entrance. The breaches were not cut to ground level and the original dike remained intact and uncompromised by the breaches. That is, the dike has not failed to impede water movement and the integrity of the dike was not weakened by the breaches. The original outline, dimensions of the dike, remained visible despite the breaches.
(Emphasis added.) These findings are supported by competent, substantial evidence in the record and do not indicate that boats could pass through the dike under ordinary conditions; rather, they indicate that boats could pass only when the water level outside the dike was sufficiently high during abnormal conditions such as a flood. Smith testified at the administrative hearing that the "notches" made in the dike were not brought down to grade, i.e., they did not go to the bottom of the land or to marsh level. Instead *1202 the cuts stopped three to four feet above the land on which the dike had been constructed. Smith testified that the notches were such "that you could have taken a boat through if the water was up, yeah" (emphasis added); but, he also testified that after the notches were cut, he continued his agricultural activities on the property and continued to use his pumps to control the water level in the canal. SAVE has directed us to nothing in the record indicating that the water outside the dike ever rose to a level high enough to allow boats to pass through the notches, or that any boats ever passed through the breaches before the breaks or notches were filled.

2.
As to the second contention, SAVE has not cited any authority that supports the proposition that Smith was required to obtain "written authorization" to conduct the filling activities, nor has it identified what type or form of "written authorization" should have been obtained. We note that no written authorization to proceed under this exemption is required by subsection 403.813(2)(g).

3.
This brings us to SAVE's third contention, that Smith wholly failed to qualify for an exemption under subsection 403.813(2)(g). This is a multifaceted argument that we reject in all respects. SAVE cites no statute, rule, or other authority to support its contention that Smith was required to submit written original design specifications to the agency prior to the commencement of activity covered by that exemption. Nor does SAVE cite any authority to support its contention that the exemption under this subsection is limited to "routine" or "custodial" maintenance that conceptually excludes refilling the breaks from the scope of the exemption. Subsection 403.813(2)(g) requires only that the dike be restored to "its original design specifications." The record indicates that the District assured Smith that the restoration activity qualified for this exemption. The District's former director (Woodson 1982-87) testified that during a meeting between Smith, the District's general counsel, and Woodson, Smith was told that the filling of the notches was exempted from permitting under the "Dike Maintenance Exemption," and he expected Smith to rely on that representation since he had the authority to make permitting decisions for the District. Woodson later instructed a field inspector (Carr) to be on the site to monitor Smith's filling activity. The District's current director of permitting (Elledge) also testified that the section "403 exemption" was applied to Smith's restoration of the dike, and that the filling of the breaches "would have been considered a maintenance activity" under the exemption. Elledge's testimony also indicated that the District was aware of the original design specifications of the original dike and its condition after the notches were made because there were plans in the District's files showing where the notches were located and to what dimension they were constructed, and the field inspector was instructed to go out to the site and inspect the filling activities to make sure that the activities were limited to filling of these notches.
As a general rule, the administrative construction of a statute by the agency responsible for its administration is entitled to great weight when it involves a matter of agency expertise, and its construction should not be overturned unless clearly erroneous. See Department of Admin. v. Moore, 524 So.2d 704 (Fla. 1st DCA 1988). Whether or not the District's interpretation of the language of subsection 403.813(2)(g) is infused with agency expertise, its construction in this instance is not clearly erroneous. The last sentence in subsection (g) suggests that activities involving "restoring" a dike to its original design specification are exempted, and the ordinary meaning of restore would cover his 1986 filling of the breaks cut in the dike, since "restore" means "1. To bring back into existence or use; re-establish: restore law and order. 2. To bring back to a previous, normal condition: restore a building... ." The American Heritage Dictionary of the English Language 1108 (new college ed. 1979).
We also agree with the Commission that the principal case relied on by SAVE to support its arguments on this point, Church of Jesus Christ of Latter-Day Saints v. St. *1203 Johns River Water Management Dist., 489 So.2d 59 (Fla. 5th DCA), rev. denied, 496 So.2d 142 (Fla. 1986), is materially distinguishable and does not preclude the application of the subsection 403.813(2)(g) exemption in this case. In the cited case, the court held that the applicant seeking to rebuild dikes on ranch land was not entitled to a subsection 403.813(2)(g) maintenance exemption for two reasons: (1) the church had failed to carry its burden of proving the original design specifications of the dike system which could not now be determined, and (2) the rebuilding would require extensive work since the dikes had not been maintained for over 25 years, the dike system had subsided, and the dike failed to keep water off the ranch during that period. In the case now before us, the dike never ceased to function as intended even with the breaks or notches cut in it; it kept water off of the land so as to permit farming activities to continue; and there was no problem determining the original design specifications of the dike by visually observing the undisturbed portions of the original dike.

D.
In view of the foregoing discussion, we reject without further explanation SAVE's argument that remand of the case to the District is necessary for further and more adequate findings on the legality of the original dike construction and the filling of the breaks or notches. The numerous findings made on this issue render this argument patently frivolous.

E.
SAVE's second major argument contends that the Commission's final order should be reversed because there is no competent, substantial evidence in the record showing that Appellees demonstrated that the MSSW system covered by the permit is consistent with all of the overall objectives of the District. Citing rule 40C-4.301(1)(a)14, Florida Administrative Code, SAVE argues that applicants are obligated to provide reasonable assurances that their systems are consistent with the overall objectives of the District. Asserting that "for the past twenty-five years, the District has been cooperating with the federal government on a basin project to restore and maintain the floodplain of the upper St. Johns River, to be accomplished primarily through the acquisition and regulation of the floodplain in the basin." SAVE argues that the "Recommended Order did not make a specific finding that the loss of additional floodplain that will be caused by this project is consistent with the District's objective to restore the Upper St. Johns River Basin." Urging that MSSW permits must be consistent with this objective, SAVE points out that no findings of consistency with this objective were made by the hearing officer or the District, nor did Appellees provide any evidence to prove this essential finding at the section 120.57 hearing. Thus, SAVE argues, the Commission erred in not granting its request that the case be remanded for findings on whether the MSSW permit is consistent with the District's floodplain restoration objectives. SAVE urges that, as in Matter of Surface Water Permit No. 50-01420-S, Challancin v. Florida Land and Water Adjudicatory Comm'n, 515 So.2d 1288 (Fla. 4th DCA 1987), where the proposed development was ruled to be inconsistent with established state policy to restore and protect Lake Okeechobee and adjacent lands, we should do the same in this case.
We find this argument unsupported by the record and the law cited by SAVE. The hearing officer's recommended order contains several pages of findings of fact relating to the factors required to be established by an applicant seeking an MSSW permit, as set forth in section 403.813(2)(g) and rules 40C-4.091, 40C-4.301, 40C-41.063, 40C-42.041 and 40C-42.061. These findings of fact support the recommended conclusion of law that:
12. As to each of the engineering, water quality, and environmental criteria applicable as outlined above, the Applicant has established and has provided reasonable assurance, that the construction, operation, and maintenance of the proposed project will not adversely affect the water quality standards in waters of the state.
13. Additionally, the Applicant has established that the proposed project will not, on balance, adversely affect the wetlands on-site and has shown that the wetland *1204 functions will be enhanced by the wetlands to be created on the subject site. It is anticipated that the wetland to be created will function more effectively than those areas to be disrupted.
These recommendations and the supporting findings of fact were adopted in the District's final order.
The Commission's order, in ruling on this issue, states:
11. With regard to DER's second point on the inconsistency between the overall objectives of the district and the permitting project, the Hearing Officer concluded that the overall objectives of the district were met by the applicant. This is also another instance of the issue not being litigated. And what party is better able to find that the issuance of the permit is not consistent with the district objectives than the district's governing board. The board did not so state by its vote to accept the Hearing Officer's recommendation and issue the permit. Moreover, our purpose in conducting this review is to ensure that the order of the district is consistent with the purposes and provisions of Chapter 373, Florida Statutes. DER does not cite a provision or purpose of Chapter 373 that is violated by the issuance of the permit. (Nor does SAVE in its brief filed in this review proceeding.) Instead, DER states it is unable to recommend to the Commission that the order is consistent without findings concerning the overall objectives of the district with regard to acquiring floodplain in the upper St. Johns River basin and for that reason recommends remand.
12. SAVE argues, largely for the same policy reasons, and on the basis of evidence appended to its brief that is outside the record,7
7 Smith's Motion to Strike this evidence from the record is granted. See Rule 42-2.014(3) and f.n. 3, above.
that the permit should be rescinded or the case remanded for findings on the issue of consistency with the district's objective of resorting the upper basin of the St. Johns. As we state in footnote 3, above, our review is appellate in nature by virtue of Section 373.114,8
8 Section 373.114(1)(b), F.S.
and our own rules prohibit consideration of evidence outside the record.9
9 Rule 42.2014(3), F.A.C.
As Smith argues in his brief:
SAVE has not shown in the record, and cannot show, that the Sabal Hammocks project would interfere with any programmed work or acquisition of the Upper St. Johns River Basin Project. SAVE has not shown in the record, and cannot show, that the Sabal Hammocks project reduces floodplain storage in the St. Johns River. SAVE has not shown in the record and cannot show, that the Sabal Hammocks project would destroy wetland resources of the St. Johns River. SAVE has not shown in the record, and cannot show, that the Sabal Hammocks project would reduce water quality to the St. Johns River. There is absolutely no record support for SAVE's claims regarding policy conflicts ... (Smith's Answer Brief, pgs. 18-19).
13. While there is nothing in this record to justify rescinding the permit or remanding the case, the point made by SAVE, DER and the Florida Game and Fish Commission10
10 See letter from the Game and Fish Commission to Carol Browner, Secretary of DER, dated October 10, 1991, attached to DER's recommendation.
regarding floodplain policy is one that demands attention. The objective of protecting floodplain in the upper basin of the St. Johns River, and for that matter statewide, should be of the highest priority to the St. Johns River Water Management District, other water management districts, and the Department of Environmental Regulation. We therefore direct the districts and DER to commence the development of floodplain protection policy and request the Secretary of the Department, in conjunction with the Executive Directors of the Districts, to report to us on the status of the development of such policy *1205 on a DER agenda within 6 months of the execution of this order, that is by the May 19, 1992 meeting of the Government and Cabinet. Furthermore, confined as our review is to the record of this proceeding, we do not regard our affirmance of the Final Order of the district as setting any precedent for development in floodplains.
(Emphasis added.)
SAVE does not dispute the hearing officer's findings of fact in support of these conclusions. Rather, its argument focuses entirely on the failure of the recommended order, the District's final order, and the Commission's order to require further findings on whether the project covered by the application is consistent with the objective of the District to restore the historic floodplain of the upper St. Johns River basin. However, this specific objective is not referred to in any of the cited rules and, as the Commission ruled, this specific objective was not the subject of any proof of non-rule policy presented at the section 120.57 hearing. Hence, SAVE failed to establish on this record that there was any such objective or policy in effect at the time this application was being processed. Finding an absence of any such policy or objective, the Commission directed that the appropriate state agencies establish such policy and report back within six months. The Commission committed no error in ruling that it could not remand for further proceedings for the purpose of showing compliance vel non with an unproven and unestablished policy. For this reason, SAVE's reliance on Matter of Surface Water Permit No. 50-01420-S, 515 So.2d 1288, is entirely misplaced, as there was ample evidence in that case establishing the stated policy and objective regarding the protection of Lake Okeechobee.
In its argument to this court, SAVE erroneously attempts to rely on what it characterizes as "record evidence" establishing the District's objective of restoring the historic floodplain. This "record evidence" consists primarily of the statements of Commission members made at the Commission's meeting and statements made in the Commission's final order. Obviously, these matters do not constitute matters of evidence that have been properly admitted in the record. The transcript of the Commission hearing indicates that none of the individuals named in SAVE's argument (Attorney General Butterworth, Insurance Commissioner Gallagher, and Education Commissioner Castor) gave sworn testimony intended to be evidence in the case. Indeed, the Commission's order properly notes the limitation imposed by its appellate function and that its decision in this case must be confined to the evidence made in the record at the section 120.57 hearing.
SAVE has not directed us to an applicable permitting rule or to a portion of the record that establishes the existence of an enforceable "objective" that the District failed to consider, and has not challenged the findings that the applicant has met all other applicable permitting requirements. Therefore, we find no error in the Commission's ruling on this issue.
The Commission's order is AFFIRMED.
ERVIN and ALLEN, JJ., concur.
NOTES
[1] SAVE is the acronym for Sportsmen Against Violating the Environment. It is an organization of individual persons and representatives from groups who use the waters of Lake Poinsett and its surrounding areas for recreational and business purposes. No issue is made regarding SAVE's standing to litigate the issues raised in this case.
[2] The District's statutory authority to require and process permits for the construction or alteration of any stormwater management system is set forth in section 373.413, Florida Statutes (1991). Subparagraph (1) of that section permissively authorizes the governing board of the District to require permits and impose reasonable conditions to assure that such construction or alteration "will comply with the provisions of this part and applicable rules promulgated thereto and will not be harmful to the water resources of the district." The Department of Environmental Regulation is given concurrent authority to exercise such permitting authority; "however, to the greatest extent practicable, such power should be delegated to the governing board of a water management district." Section 373.016(3), Fla. Stat. (1991).
[3] The Commission ruled that the legality of the perimeter of the original dike was not litigated because this issue was not pleaded in SAVE's initial pleading and SAVE did not offer any proof in support of this contention. SAVE contends this ruling is manifest error because the hearing officer "made specific findings of fact and conclusions of law regarding the legality of the original dike as well as closure of the breaches." We need not be concerned with the correctness of this specific ruling, however, because the Commission further concluded, on the basis of the record before it, that the applicant Smith made a prima facie showing that the dike was legally constructed, and thereby shifted the burden to SAVE to dispute this showing by the presentation of contradictory evidence, a burden which the Commission found SAVE failed to carry.
[4] This rule and the parties refer to the "Applicant Handbook" as providing additional information regarding the permitting requirements. We note, however, that the handbook is not part of the rule, and it was not included in this record, even though a portion of it was quoted in the hearing officer's recommended order. In any event, it is not necessary to review the hand-book's contents to decide this appeal.
[5] This permitting authority under chapter 253 was later transferred to DER.
[6] We also take note of SAVE's argument that subsection 403.813(2)(g) conflicts with subsection 373.406(2) (which does not require an MSSW permit to alter the topography of the land if agricultural activity is involved) because subsection 403.813(2)(g) exempts activities not exempted under section 373.406, and the only way to avoid the conflict is to give greater weight to section 373.406 because it applies specifically to MSSW permits and does not apply to the activity in the present case that impounds or obstructs surface water. We decline to consider this argument because the record indicates that it was neither raised below nor ruled on by the hearing officer, the District, or the Commission.